# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| THE WILLIAMS COMPANIES, INC., <br><br> Plaintiff and Counterclaim Defendant, <br><br> v. <br><br> ENERGY TRANSFER EQUITY, L.P. and LE GP, LLC, <br><br> Defendants and Counterclaim Plaintiffs. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 12168-VCG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| THE WILLIAMS COMPANIES, INC., <br><br> Plaintiff and Counterclaim Defendant, <br><br> v. <br><br> ENERGY TRANSFER EQUITY, L.P., ENERGY TRANSFER CORP LP, ETE CORP GP, LLC, LE GP, LLC, and ENERGY TRANSFER EQUITY GP, LLC, <br><br> Defendants and Counterclaim Plaintiffs. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 12337-VCG <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM OPINION

Date Submitted:  June 23, 2016
Date Decided:  June 24, 2016

Kenneth J. Nachbar and Zi-Xiang Shen, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; OF COUNSEL:  Sandra C. Goldstein, Antony L.

Ryan, and Kevin J. Orsini, of CRAVATH, SWAINE & MOORE LLP, New York, NY, *Attorneys for the Plaintiff and Counterclaim Defendant*.

Rolin P. Bissell, Tammy L. Mercer, and James M. Yoch, Jr., of YOUNG CONAWAY STARGATT & TAYLOR LLP, Wilmington, DE; OF COUNSEL: Michael C. Holmes, John C. Wander, Michael L. Charlson, and Craig E. Zieminski, of VINSON & ELKINS LLP, Dallas, TX, *Attorneys for the Defendants and Counterclaim Plaintiffs*.

GLASSCOCK, Vice Chancellor

This matter is before me after expedited discovery and a two-day trial, in light of the imminent proposed merger (the "Proposed Transaction") between The Williams Companies, Inc. ("Williams"), a Delaware corporation, and Energy Transfer Equity, L.P. (the "Partnership" or "ETE"), a Delaware limited partnership. The companies are substantial participants in the gas pipeline business. The Proposed Transaction is an unusual structure, accommodating Williams' desire for its stockholders to continue to be holders of publicly traded common stock (as opposed to partnership units) and to receive a substantial cash payment, in return for Williams' assets being acquired by the Partnership. The Proposed Transaction had been pursued assiduously by the Partnership and it was heavily negotiated. Those negotiations were "tax-intensive"; in other words, there were many potential negative tax ramifications to the Proposed Transaction, which the parties found substantial, and to avoid which the parties negotiated comprehensively.

Under the final terms of the Proposed Transaction, as set out in Agreement and Plan of Merger dated September 28, 2015 (the "Merger Agreement"),[1] the Partnership created Energy Transfer Corp LP ("ETC"), a Delaware limited partnership that is taxable as a corporation, into which Williams would merge. ETC would then transfer the former Williams assets and 19% of ETC's common stock to the Partnership, in return for partnership units equivalent in value to the ETC stock

---

[1] JX 52 (the "Merger Agreement").

1

on a one-share-for-one-unit basis, together with $6 billion in cash. The cash would then be distributed to the former Williams stockholders.

After the Merger Agreement was entered, the energy market—and thus the value of assets used in the transport of energy, of the type held by Williams and the Partnership—experienced a precipitous decline. The Partnership units, which are publicly traded, within a few months after signing the deal had dropped to between a third and a half of their value at signing. Since a part of the consideration for Williams was $6 billion in cash, to obtain which the Partnership would have to borrow against its devalued assets, the Proposed Transaction quickly became financially unpalatable to the Partnership. It became clear to the parties and to the interested public that the Partnership desired an exit from the Merger Agreement as strongly as it had desired to enter the agreement in the first place.

It is against this background that I examine the issues presented to me for determination. While these are described more fully below, of primary importance to my decision is a condition precedent to consummation of the Merger Agreement: the issuance of an opinion by the Partnership's tax attorneys, Latham & Watkins LLP ("Latham"), that a specific transaction between ETC and the Partnership "should" be treated by the tax authorities as a tax-free exchange under Section 721(a) of the Internal Revenue Code (the "721 Opinion"). At present, Latham is unable to issue such an opinion; should that continue, under the terms of the Merger

2

Agreement between the parties, that will allow the Partnership to terminate the Merger Agreement. Williams maintains that the Partnership materially breached its contractual obligations by failing to use "commercially reasonable efforts" to secure the required 721 Opinion. As a result, according to Williams, the Partnership should be estopped from terminating the Merger Agreement on the ground that a condition precedent has not been met.

It is clear to me that the Proposed Transaction, so ardently desired by the Partnership at the time the deal was inked, is now manifestly unattractive to the Partnership. It is in the Partnership's interest to avoid the transaction if possible. It is that motivation on which Williams primarily relies to demonstrate lack of "commercially reasonable efforts" on the part of the Partnership. I approached this matter with a skeptical eye, in light of that motivation, as well as the Partnership's post-signing issuance of new ETE units, through which (according to Williams at least) certain large ETE equity holders have insulated themselves from the adverse effects of the Proposed Transaction, at the expense of both Williams stockholders and other ETE unit holders.[2] Just as motive alone cannot establish criminal guilt, however, motive to avoid a deal does not demonstrate lack of a contractual right to do so. If a man formerly desperate for cash and without prospects is suddenly flush,

---

[2] A class of ETE unit holders has brought an expedited action to rescind this equity issuance, which is also among the relief sought by Williams here. That matter is proceeding before me separately. *See In re Energy Transfer Equity, L.P. Unitholder Litig.*, C.A. No. 12197-VCG (Del. Ch.).

3

that may arouse our suspicions. Nonetheless, even a desperate man can be an honest winner of the lottery. Because I conclude that Latham, as of the time of trial, could not in good faith opine that tax authorities should treat the specific exchange in question as tax free under Section 721(a); and because Williams has failed to demonstrate that the Partnership has materially breached its contractual obligation to undertake commercially reasonable efforts to receive such an opinion from Latham, I find that the Partnership is contractually entitled to terminate the Merger Agreement, assuming Latham's opinion does not change before the end of the merger period, June 28, 2016 (the "Outside Date").[3]

The Merger Agreement is subject to Delaware law.[4] Delaware is strongly contractarian, and the presence of a provision in favor of specific performance in case of breach, as the parties contracted for here, must be respected. Conditions precedent to the transaction must be enforced as well, and granting Williams' request to use the power of equity to consummate the Proposed Transaction would force the Partnership to accept a risk—potential imposition of substantial tax liability—without the comfort of a tax opinion from Latham. This, the parties did not contract for, and the equitable equivalent of an order of specific performance as sought here by Williams is unavailable.

---

[3] Merger Agreement § 7.01(b)(1).
[4] *Id.* § 8.08.

My reasoning, and my treatment of the other issues presented, follows.

## I. BACKGROUND

*A. The Parties*[5]

Plaintiff Williams is a Delaware corporation with its principal executive offices located in Tulsa, Oklahoma. The company's stock is traded on the New York Stock Exchange (the "NYSE") under the symbol "WMB." Williams is a leading North American energy infrastructure company focused on connecting North America's hydrocarbon deposits to the growing market for natural gas, natural gas liquids, and olefins. The company owns and operates midstream gathering and processing assets and interstate natural gas pipelines.

Defendant ETE is a Delaware limited partnership with its principal executive offices located in Dallas, Texas. The Partnership's common units trade on the NYSE under the symbol "ETE." The Partnership's family of companies owns and operates approximately 71,000 miles of natural gas, natural gas liquids, refined products, and crude oil pipelines.

Defendant ETC is a Delaware limited partnership taxable as a corporation. Pursuant to the Proposed Transaction, Williams will merge with and into ETC. Following the consummation of the Proposed Transaction, ETC will be the

---

[5] Information about the parties is drawn from the Joint Pre-Trial Stipulation and Order ("Pre-Trial Order"). The facts are admitted by the parties and require no further proof. *See* Pre-Trial Order, at 5–6.

managing member of the general partner of the Partnership.

Defendant ETE Corp GP, LLC ("ETE Corp") is a Delaware limited liability company and the general partner of ETC.

Defendant LE GP, LLC ("LE GP") is a Delaware limited liability company and the general partner of the Partnership.

Defendant Energy Transfer Equity GP, LLC ("ETE GP") is a Delaware limited liability company. Pursuant to the Proposed Transaction, ETE GP will merge with LE GP such that ETE GP will be the surviving company and general partner of the Partnership.

*B. Relevant Non-Parties*

A number of individuals played key roles in the Proposed Transaction and are mentioned throughout my decision: Frank MacInnis, Chairman of Williams; Alan Armstrong, CEO of Williams; Kelcy Warren, Chairman and CEO of the Partnership; Brad Whitehurst, the Partnership's Executive Vice President and Head of Tax; and Jamie Welch, the former CFO of the Partnership.

In addition, there are several law firms that played key roles in the Proposed Transaction. Cravath, Swaine & Moore LLP ("Cravath") served as Williams' deal counsel and provided tax advice. Working with Williams was Minh Van Ngo, a corporate partner, and Andrew Needham, a tax partner, from Cravath. Cravath also served as litigation counsel to Williams. In addition, Gibson, Dunn & Crutcher LLP

6

("Gibson") served as deal counsel to Williams.

Latham provided tax advice to the Partnership and was appointed in the Merger Agreement to deliver the 721 Opinion. Timothy Fenn and Larry Stein are tax partners at Latham who were consulted by the Partnership. The Partnership also received tax advice from Morgan, Lewis & Bockius LLP ("Morgan Lewis") and Morgan Lewis tax partner Bill McKee. Wachtell, Lipton, Rosen & Katz ("Wachtell") served as deal counsel to the Partnership. Corporate partner Alison Preiss from Wachtell was one of the partners advising the Partnership. Finally, Vinson & Elkins LLP ("V&E") served as litigation counsel to the Partnership.

*C. The Parties Execute the Merger Agreement*

Following negotiations between Williams and the Partnership,[6] the parties executed the Merger Agreement on September 28, 2015. The Merger Agreement contemplates a series of transactions, or exchanges, that together form the "Proposed Transaction."

Pursuant to the Merger Agreement, Williams will merge into ETC, a newly created affiliate of the Partnership, with ETC surviving the merger (the "Merger").[7] As a result of the Merger, the former Williams assets (the "Williams Assets") will be held by the surviving entity, and the former Williams stockholders will receive a

---

[6] The parties have provided a thorough description of the background of the negotiations, which I refer to throughout when necessary.

[7] Merger Agreement § 1.01(a).

7

right to consideration consisting of (1) ETC shares representing approximately 81% of the surviving entity; (2) $6.05 billion in cash; and (3) certain contingent consideration rights.[8]

The Merger Agreement also contemplates two transactions, or "legs," between the Partnership and ETC. In one leg, the Partnership will transfer $6.05 billion to ETC in exchange for ETC shares (the "Hook Stock") representing approximately 19% of ETC (the "Cash Transaction").[9] ETC is then required to distribute the $6.05 billion directly to the former Williams stockholders.[10] In the other leg, ETC will transfer, or "contribute," the Williams Assets to the Partnership in exchange for newly issued Class E partnership units from the Partnership (the "Class E Units") (the "Contribution Transaction").[11] The number of Class E Units issued to ETC will equal the aggregate number of ETC shares held by the Partnership and the former stockholders of Williams.[12] The Proposed Transaction is illustrated in the following diagram:[13]

---

[8] *See id.* § 2.01(b).
[9] *Id.* § 2.02(d).
[10] *Id.* § 2.04(b).
[11] *Id.* § 1.01(b).
[12] *Id.* § 1.01(b)(iii).
[13] Pl's Opening Pre-Trial Br. 19.



In sum, upon consummation of the Proposed Transaction, ETC will own Class E Units representing approximately 57% of the limited partner interest of the Partnership. The Partnership will own the Williams Assets, as well as 19% of the outstanding ETC shares. Finally, the former Williams stockholders will own 81% of the outstanding ETC shares and will have received $6.05 billion in cash. Following the consummation of the Proposed Transaction, therefore, the relationship of the parties will be as follows:[14]

---

[14] *Id.* at 20.

9



I note that, because the number of Class E Units issued will equal the number of ETC shares issued, each ETC share will correspond to an equivalent Class E Unit. Thus, any distribution that ETC pays on its common shares will directly correspond to the distributions ETC receives on the Class E Units it holds.

### D. The Energy Markets Decline

Since the Merger Agreement was executed, conditions in the energy markets have deteriorated.[15]   In light of its obligation to deliver $6.05 billion in cash, the Partnership and its Chairman Kelcy Warren have become increasingly troubled with

---

[15] Trial Tr. 84:7–10 (Van Ngo).

10

its potential overall debt levels, as ratings agencies have indicated concern.[16] In December 2015, Warren led discussions within the Partnership that highlighted the problems with the Proposed Transaction. He suggested that the Partnership seek to renegotiate the terms of the Merger Agreement.[17] Further, the Partnership's former CFO Jamie Welch testified that, by January 2016, Warren would have preferred terminating the Merger Agreement to restructuring.[18] The parties have since discussed the possibility of restructuring and even terminating the Merger Agreement.[19] Thus far, however, such talks have been unsuccessful.

*E. The Partnership Announces a Special Equity Issuance*

Due to its concerns regarding the cash component of the Proposed Transaction, the Partnership began considering various financing alternatives.[20] It eventually determined to issue a new class of equity units that would require its holders to forgo normal cash distributions in exchange for the right to later convert the units into common units of the Partnership.[21] The Partnership expected that by reducing its cash distributions in the short term, it could increase its cash available to manage its bridge financing.[22]

---

[16] *Id.* at 193:24–194:15 (Whitehurst).
[17] *Id.* at 194:24–195:10 (Whitehurst).
[18] *Id.* at 115:11–24 (Whitehurst).
[19] *Id.* at 31:16–32:8 (MacInnis); *id.* at 196:5–21 (Whitehurst).
[20] JX 83.
[21] JX 295.
[22] McReynolds Dep. 136:7–17.

Initially, the Partnership sought to issue the new class of securities to the public (the "Proposed Public Offering").[23] Williams, however, refused to cooperate with the Partnership and effectively blocked the Proposed Public Offering. To offer securities to the public, the Partnership is required to file a Form S-3 to register the securities with the Securities and Exchange Commission. In that filing, the Partnership must include updated financial information from Williams, as well as an opinion from Williams' external auditor, which in turn requires the auditor's consent.[24] In February 2016, the Partnership asked Williams to agree to provide these items, and Williams refused.[25]

Still determined to execute an offering, the Partnership announced on March 8, 2016 that it had completed a private offering (the "Special Issuance") of Series A Convertible Preferred Units representing a limited partner interest in the Partnership (the "Convertible Units").[26] The Convertible Units were issued to select investors who elected to participate in a plan (the "Plan") for a period of up to nine fiscal quarters, commencing with the fiscal quarter ending March 31, 2016 (the "Plan Period").[27] Each investor that elected to participate in the Plan ("Electing Unitholders") received one Convertible Unit for each common unit participating in

---

[23] JX 295.
[24] Armstrong Dep. 206:15–207:1.
[25] *Id.* at 207:12–22.
[26] JX 323.
[27] *Id.*

the Plan ("Participating Units").[28]  In order to perfect the Special Issuance, I note, the Partnership was required to amend its limited partnership agreement.[29]

The Special Issuance has two notable features: a dividend reinvestment feature and a preferred dividend feature.  With respect to the dividend reinvestment feature, Electing Unitholders will forgo any quarterly cash distribution exceeding $0.11 per unit for the period leading up to the consummation (or termination) of the Proposed Transaction.[30]  Electing Unitholders will instead receive an accrual of value equal to the difference between $.285 per quarter and the actual cash distribution received (the "Conversion Value").[31]  At the end of the Plan Period, the total Conversion Value will automatically convert into common units of the Partnership based on a unit price equal to 95% of the five-day volume-weighted average closing price of the Partnership's unit price immediately prior to the Special Issuance.[32]

With respect to the preferred dividend feature of the Plan, for each quarter following the consummation (or termination) of the Proposed Transaction, Electing Unitholders are entitled to receive $0.11 per Convertible Unit before the Partnership is permitted to pay any cash distributions to its common unitholders.[33]  During that

---

[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.*

13

time, Electing Unitholders will forgo all distributions that would otherwise flow to their Participating Units.[34]

According to its public filings, the Partnership issued 329,299,267 Convertible Units to Electing Unitholders, representing participation by approximately 31.5% of the Partnership's total outstanding common units.[35] Notably, the Partnership's Chairman, Kelcy Warren, participated in the Plan with respect to substantially all of his common units, which represent approximately 18% of the Partnership's total outstanding common units.[36]

Barely a month after announcing the Special Issuance, the Partnership announced on April 18, 2016 that it "does not expect to make any cash distributions with respect to its common units prior to the distribution payable with respect to the quarter ending March 31, 2018."[37] Instead, its available cash will be "used to make cash distributions on Convertible Units and to repay a portion of the indebtedness incurred by the Partnership in connection with the merger."[38] Therefore, as explained in ETC's final proxy statement, the Partnership "does not expect to receive any cash distribution savings until such time from forgone distributions on [Participating Units], or to repay any debt from such cash distribution savings."[39]

---

[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] JX 153, at 25.
[38] *Id.*
[39] JX 186.

14

*F. Latham Determines It Is Unable to Issue the 721 Opinion*

A significant aspect of the Proposed Transaction are the tax consequences of each of the transactions encompassed therein. Accordingly, the Merger Agreement includes several provisions that define the parties' understandings of, and obligations related to, the tax considerations of the Proposed Transaction.

Among the important tax issues is the application of Section 721(a) of the Internal Revenue Code to the Contribution Transaction. Section 721(a) provides that "[n]o gain or loss shall be recognized to a partnership or to any of its partners in the case of a contribution of property to the partnership in exchange for an interest in the partnership."[40] Again, the Contribution Transaction is the exchange in which ETC will transfer, or "contribute," the Williams Assets to the Partnership in exchange for Class E Units. It was the parties' intention that the Contribution Transaction would qualify as a tax-free contribution pursuant to Section 721(a).[41] In addition, the parties negotiated an assurance that the Contribution Transaction would receive such tax treatment as of the date of closing: the Merger Agreement includes a condition to closing that Latham provide ETC and Williams a written opinion—which I refer to as the 721 Opinion—dated as of the closing date, "to the effect that

---

[40] I.R.C § 721(a).
[41] In the recitals to the Merger Agreement, the parties state that the "Contribution and the Parent Class E Issuance are intended to qualify as an exchange described in Section 721(a) of the Code." Merger Agreement, at 1–2.

15

the Contribution and the Parent Class E Issuance *should* qualify as an exchange to which Section 721(a) of the Code applies."[42]  As of the date of the trial, however, Latham has determined that it cannot issue the 721 Opinion.

While Latham is ultimately responsible for making the determinations encompassed in its 721 Opinion, the parties represented their understanding of the tax consequences in the Merger Agreement.  In Article III of the Merger Agreement, Williams, the Partnership, and ETC represented that neither they, nor any of their subsidiaries, "has taken or agreed to take any action or knows of the existence of any fact that would reasonably be expected to prevent . . . the Contribution and Parent Class E Issuance from qualifying as an exchange to which Section 721(a) of the Code applies."[43]  In addition, Latham believed that it could deliver the 721 Opinion and considered the Section 721(a) issue "fairly straightforward."[44]  Cravath likewise had no concern about the delivery of the 721 Opinion.[45]  Therefore, at the time the Merger Agreement was executed, the parties and their tax advisors understood that the Contribution Transaction should qualify as a tax-free contribution under Section 721(a).[46]

In early 2016, however, the Partnership and its tax counsel Latham began to

---

[42] *Id.* § 6.01(h) (emphasis added).
[43] *Id.* §§ 3.01(n)(1), 3.02(n)(i).
[44] Trial Tr. 218:5–9, 222:9–21, 282:12–15 (Fenn).
[45] *Id.* at 346:8–11 (Needham).
[46] *Id.* at 341:14–342:6 (Needham).

reevaluate the two legs between the Partnership and ETC. Following the decline in energy markets, Whitehurst, the Partnership's Head of Tax, began evaluating the tax implications of potential actions that the Partnership might take in response to the distress in the energy sector.[47] In particular, he was considering tax issues that could arise if the Partnership decided to cut a portion of its cash distributions.[48] In late March, while reviewing a draft of the S-4, Whitehurst discovered an aspect of the Cash Transaction that—according to Whitehurst—he had not before considered.[49] To reiterate, the Cash Transaction is the leg in which the Partnership will transfer to ETC $6 billion in cash in exchange for 19% of ETC's stock. Despite the fact that he had reviewed drafts of transaction documents and other deal-related materials that said otherwise,[50] and while no one else shared his view,[51] Whitehurst testified that he originally understood the Cash Transaction to require the Partnership to exchange $6 billion in cash for a *floating* number of ETC shares.[52] Upon review of the S-4, however, Whitehurst realized that the number of ETC shares exchanged were *fixed* in the Merger Agreement.[53] Therefore, due to the decline in the Partnership's unit price, and because Partnership units and ETC shares are intended to be similar in

---

[47] *Id.* at 129:18–130:5 (Whitehurst).
[48] *Id.* at 130:6–11 (Whitehurst).
[49] *Id.* at 151:19–23 (Whitehurst).
[50] *Id.* at 152:4–153:14 (Whitehurst).
[51] *See, e.g., id.* at 49:17–50:8 (Van Ngo); *id.* at 103:15–104:16 (Welch); *id.* at 321:19–322:16 (Preiss).
[52] *Id.* at 131:5–132:22, 150:19–151:11 (Whitehurst).
[53] *Id.*

17

value, the Partnership stood to receive ETC shares that were significantly less valuable than the $6 billion price the Partnership was obligated to pay.[54] Whitehurst testified that the ETC shares were worth approximately $2 billion, creating a $4 billion delta.[55]

Based on that oversight, Whitehurst worried that the IRS could attribute the excess cash to the other leg (the Contribution Transaction) and thus trigger taxable gain.[56] Alarmed by the realization of his mistake and the resulting potential tax consequences, Whitehurst contacted Timothy Fenn of Latham on March 29, 2016 to confirm his understanding of the structure of the Cash Transaction.[57] Fenn informed Whitehurst that his original understanding was incorrect and confirmed that the Merger Agreement called for an exchange of a fixed number of ETC shares for cash.[58] Whitehurst, therefore, asked Fenn to determine if the Partnership had a tax issue and, if so, whether there was a fix and how the issue could affect Latham's 721 Opinion.[59] Around that time, Whitehurst also contacted Kelcy Warren, the Partnership's Chairman and CEO. Whitehurst informed Warren that he had identified an issue concerning Section 721(a) and that the 721 Opinion was a

---

[54] *Id.*
[55] *Id.*
[56] *Id.* at 131:20–132:15 (Whitehurst).
[57] *Id.* at 132:16–22 (Whitehurst).
[58] *Id.* at 132:23–133:2 (Whitehurst).
[59] *Id.* at 134:2–12 (Whitehurst).

condition to closing.[60]

Before its conversation with Whitehurst, Latham was preparing to issue the 721 Opinion and had never considered that it would be unable to issue it.[61] Indeed, Latham had previously never considered how any movement in the Partnership's unit price might affect Latham's ability to give the 721 Opinion.[62] Following the conversation with Whitehurst, Fenn was initially skeptical that any problem existed.[63] He and other attorneys at Latham, including tax partner Larry Stein, began analyzing the transaction, paying close attention to the decrease in value of the Partnership's units.[64] During this time, Latham held multiple discussions with the Partnership, Wachtell, the Partnership's deal counsel, and V&E, the Partnership's litigation counsel,[65] and consulted six other tax partners at Latham.[66] Latham soon made initial indications to the Partnership that it was probably unable to render the 721 Opinion.[67] Latham had discovered for the first time that the complex interactions between the Contribution and Cash Transactions could have significant tax implications under Section 721(a).[68] Specifically, Latham was concerned by

---

[60] *Id.* at 197:3–9 (Whitehurst).
[61] *Id.* at 281:4–7 (Fenn).
[62] *Id.* at 282:7–15 (Fenn).
[63] *Id.* at 284:20–285:5 (Fenn).
[64] *Id.* at 230:1–231:13, 232:10–18 (Fenn).
[65] *See, e.g.*, *id.* at 314:13–3:15–7 (Preiss). I note that Eiko Stange, a tax partner from Wachtell, expressed skepticism on certain aspects of Latham's position. *Id.* at 327:15–20 (Preiss).
[66] *Id.* at 240:15–21 (Fenn).
[67] *Id.* at 234:9–11 (Fenn).
[68] *Id.* at 233:3–234:8 (Fenn).

what it perceives as an inverse relationship between the two legs: as excess cash is generated by the Cash Transaction, the Contribution Transaction generates value by an equal but opposite amount. Latham refers to this relationship as the "perfect hedge."[69]

On April 7, 2016, Whitehurst contacted Bill McKee of Morgan Lewis.[70] Whitehurst asked McKee to analyze the tax implications of the Proposed Transaction, hoping to get a "fresh look," and expressed specific concerns about the change in the Partnership's unit price.[71] After the call, McKee gathered his tax team and they began analyzing the Proposed Transaction.[72]

On April 11, 2016, Latham informed the Partnership that it had conclusively determined that it could not provide the 721 Opinion if required to give its opinion on that date.[73] Specifically, Latham concluded that, due to the decline in the value of the Partnership's units—and thereby, ETC's stock—there was a risk that the IRS would not respect the two legs as separate transactions for tax purposes.[74] As a result, Latham was concerned that the IRS, under the disguised sale rules in Section 707, could attribute the cash exchanged in excess of the value of the Hook Stock to

---

[69] As described by Timothy Fenn of Latham, according to the "perfect hedge" theory, when there "is a value shift on the left leg, it moves over to the right leg so that both legs always balance." *Id.* at 254:19–23 (Fenn).
[70] *Id.* at 568:20–23 (McKee).
[71] *Id.* at 569:4–570:21 (McKee).
[72] *Id.* at 570:22–572:12 (McKee).
[73] *Id.* at 139:15–20 (Whitehurst).
[74] *Id.* at 248:19–253:3 (Fenn).

the Williams Assets contributed in the Contribution Transaction.[75] The following day, on April 12, 2016, Latham informed Cravath that it would be unable to provide the 721 Opinion if the Proposed Transaction closed on that day.[76]

On April 13, 2016, after reviewing the Proposed Transaction with his team at Morgan Lewis, McKee called Cravath to discuss the tax implications of the Proposed Transaction.[77] McKee concluded—independent of and without consulting with Latham—that he would be unable to render the 721 Opinion if asked.[78] McKee's conclusion, however, was based on a theory somewhat different from Latham's analysis—McKee explained that he has never understood Latham's "perfect hedge" theory,[79] and that the decline in the Partnership's unit price is not legally relevant in his view.[80] McKee concluded that he was concerned that the IRS may conclude that the parties had specifically allocated the cash to the Hook Stock (and not the Williams Assets) for tax purposes—a practice commonly referred to as "cherry picking"[81]—and that the Contribution Transaction was likely taxable under Section 707 as a disguised sale.[82]

---

[75] *Id.*; *see also* I.R.C § 707 (discussing disguised sales between partners and partnerships).
[76] Trial Tr. 248:9–15 (Fenn).
[77] *Id.* at 578:6–9 (McKee).
[78] *Id.* at 576:12–17 (McKee).
[79] *Id.* at 606:16–19 (McKee).
[80] *Id.* at 596:14–21 (McKee)
[81] *Id.* at 583:5–20 (McKee). Cravath tax partner Andrew Needham testified that the term "cherry picking" refers to "contractual designations of consideration that are driven substantially by tax considerations." *Id.* at 358:4–10 (Needham).
[82] *Id.* at 574:11–14.

Although it disagreed fervently with Latham's conclusion, and strongly stated its belief that the Contribution Transaction was tax free under Section 721(a), on April 14, 2016, Cravath proposed two potential solutions to the Section 721(a) issue, which it referred to as Proposal A and Proposal B.[83]  After reviewing Cravath's proposals, Latham concluded that neither proposal would allow the firm to issue the 721 Opinion.[84]  On April 29, 2016, Latham conveyed its conclusion on the proposed modifications to both Williams and Cravath.[85]

In an April 18, 2016 amendment to ETC's proxy statement, the Partnership disclosed that Latham had advised it that "if the closing of the merger were to occur as of the date of this proxy statement/prospectus it would not be able to deliver the 721 Opinion."[86]

In late April, Cravath contacted Gibson, Williams' deal counsel, to review the Section 721(a) issue.[87]  Although Gibson ultimately concluded that it could give a "weak-should" opinion if asked,[88] it initially determined that it was "tough to get to a should."[89]

Despite Cravath's staunch disagreement, Latham continues to represent that

---

[83] JX 433.
[84] Trial Tr. 268:19–21 (Fenn); *id.* at 488:13–17 (Stein).
[85] *Id.* at 270:2–10 (Fenn).
[86] JX 153, at 23.
[87] Trial Tr. 92:10–12 (Van Ngo)
[88] *Id.* at 407:17–408:1 (Needham).
[89] JX 610.

it is unable to issue the 721 Opinion and that it expects it will be unable to do so as of the closing date. I note that as part of this litigation, the parties hired experts to opine on the merits of Latham's position, and to indicate whether the 721 Opinion can be issued. Those expert opinions are discussed in my analysis.

*G. The Disclosure of the Vote of the Williams Board*

While the issue regarding the 721 Opinion, and to a lesser extent the Special Issuance, have been the main focus of the coordinated actions, the Defendants have challenged the adequacy of disclosures in the Form S-4 of the vote concerning the Williams board of directors (the "Board") to approve the Merger Agreement.

The Williams Board consists of thirteen directors, two of whom are activist investors: Keith Mesiter and Eric Mandelblatt. Sometime in September 2015, before the Board met to consider the Merger Agreement, Meister told the Board that he and Mandelblatt might start a consent solicitation if a deal was not reached.[90] Before the Merger Agreement was executed, the Williams board met on September 24, 2015.[91] The minutes of that meeting reflect a discussion regarding "the likelihood of a consent solicitation to replace all or certain Directors."[92] After Messrs. Mandelblatt and Meister left the meeting, the consequences of a potential

---

[90] Cooper Dep. 31:11–32:13.
[91] JX 605.
[92] *Id.* at 4.

consent solicitation by the activists was discussed.[93] Following discussions between the members of the Board and its advisors, the Board held an informal vote, which resulted in vote of 6-to-7 against the Merger Agreement.[94] The members of the Board then went to dinner and continued discussing the Potential Transaction, including the potential of a consent solicitation.[95]

The next morning, on September 25, 2015, the Board reconvened.[96] Following subsequent discussion, the Board formally voted to approve the Merger Agreement by a vote of 8-to-5.[97]

The Defendants challenge the proxy's characterization of the Board's consideration of the potential consent solicitation. While the background section explains that "[t]he advisors discussed with the WMB Board various considerations regarding a potential consent solicitation, including process and timing," the section that lists the material factors the Board considered in evaluating the Proposed Transaction is silent to the consent solicitation.[98]

Finally, the Defendants takes issue with the William's Board evolving characterization of its recommendation for the Proposed Transaction. Again, the William's Board originally voted in favor of the Proposed Transaction by an 8-to-5

---

[93] *Id.*
[94] Stoney Dep. 28:14–20.
[95] *Id.* at 32:4–17.
[96] JX 605 at 5.
[97] *Id.* at 6.
[98] JX 186 at 132–36.

vote. The Williams Board thereafter stated that it is "unanimously committed to completing the transaction."[99] In a later press release, however, the Williams Board stated that it is "unanimously committed to *enforcing its rights* under the Merger Agreement."[100] Similarly, the William's Board's commitment has changed from delivering the "benefits of the transaction" to the "benefits of the [Merger Agreement]."[101] Similarly, in a press release to be published on April 6, 2015—the day Williams filed its lawsuit against the Partnership and Kelcy Warren regarding the Special Issuance—Williams removed from the proposed press release that "Williams believes the transaction with [the Partnership] is and continues to be in the best interests of the stockholders and the Company."[102]

### H. Procedural History of the Coordinated Actions

This memorandum opinion addresses two related actions that have been coordinated for purposes of briefing and trial. Williams filed its first Verified Complaint against the Partnership and LE GP on April 6, 2016 (the "First Action").[103] In the First Action, Williams challenges the Special Issuance. I granted the Plaintiff's Motion for Expedite Proceedings on April 14, 2016. Shortly thereafter, the Plaintiff filed its Verified Amended Complaint on April 19, 2016. In

---

[99] JX 72.
[100] JX 128.
[101] *Compare* JX 72 *with* JX 128.
[102] JX 127.
[103] *The Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, C.A. No. 12168-VCG (Del. Ch. Apr. 6, 2016).

25

response, the Defendants filed their Answer, Affirmative Defenses, and Verified Counterclaim on May 3, 2016.

While discovery was underway in the First Action, Williams filed a second Verified Complaint on May 13, 2016 against the same defendants from the First Action, as well as defendants ETC, ETE Corp, and ETE GP (the "Second Action").[104] In the Second Action, Williams challenges the actions taken by the Defendants concerning Latham's inability to issue the 721 Opinion. On May 20, 2016, I granted the Plaintiff's Motion to Expedite the Second Action. In addition, I ordered the parties to coordinate the briefing of the First and Second Actions in order to litigate the issues concurrently. On May 24, 2016, the Defendants filed their Amended Affirmative Defenses and Verified Counterclaims (the "Counterclaims"), which address Defendants' position in the First and Second Actions.

Trial was held for both actions on June 20 and 21, 2016 in Georgetown. At the conclusion of the trial, I asked the parties to submit supplemental briefs regarding certain issues, which briefing was completed on June 23, 2016; I also indicated that I would render a written decision by June 24, 2016. This is my post-trial Memorandum Opinion.

---

[104] *The Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, C.A. No. 12337-VCG (Del. Ch. May 13, 2016).

## II. ANALYSIS

I begin my analysis by reciting the allegations of the parties, as well as the relief sought, which I have based on their pre-trial briefing and the pre-trial order. Thereafter, I analyze each pending issue, including the 721 Opinion, the Special Issuance, and the Counterclaims.

### A. Allegations of the Parties

In the First Action, Williams asserts that the Partnership breached the Merger Agreement by issuing the Special Issuance in violation of the Merger Agreement's interim operating covenants. Among others provisions, Williams points to the covenant requiring the Partnership to carry on its business in the ordinary course.

In relief, Williams seeks (1) a declaration that the Special Issuance is in breach of the Merger Agreement; (2) an injunction requiring the Defendants to take all steps necessary to unwind the Special Issuance before consummation of the Proposed Transaction; (3) a declaration that the amendment to the ETE's partnership agreement that was performed in conjunction with the Special Issuance is void and invalid; and (4) a permanent injunction enjoining the Defendants and their directors, officers, employees, and agents, and all persons acting in concert with or at the direction of any of the foregoing persons, from pursuing the Special Issuance and requiring those persons to take all steps necessary to unwind the Special Issuance and the Plan.

27

In the Second Action, Williams asserts that the Partnership breached the Merger Agreement by failing to use commercially reasonable efforts to obtain the 721 Opinion. As a result, Williams argues, the Partnership cannot rely on the failure of Latham to deliver the 721 Opinion as a basis to terminate the Merger Agreement. In addition, Williams asserts that it relied on the Partnership's representation and warranty in the Merger Agreement that it knew of no facts that would reasonably prevent the tax-free treatment of the Contribution Transaction pursuant to Section 721(a). Williams explains that the Partnership's representation was false because the Partnership did know, or should have known, of the theories upon which Latham relies in concluding that the risk of tax liability precludes the 721 Opinion. Consequently, according to Williams, the Partnership is estopped from terminating the Merger Agreement on the basis of the failure to obtain the 721 Opinion.

In relief, Williams seeks (1) a declaration that Defendants have committed material breaches of the Merger Agreement by failing to use commercially reasonable efforts to obtain the 721 Opinion, by failing otherwise to use their reasonable best efforts to consummate the Proposed Transaction, and by breaching their representation and warranty in the Merger Agreement regarding the tax-free treatment of the Contribution Transaction under Section 721(a); (2) a permanent injunction enjoining the Defendants from terminating or otherwise avoiding their obligations under the Merger Agreement on the basis that Latham has failed to

28

deliver the 721 Opinion; and (3) a permanent injunction enjoining the Defendants from terminating or otherwise avoiding their obligations under the Merger Agreement on the basis that they will fail, or have failed, to close by the Outside Date.

In its Counterclaims, which address the allegations in the First and Second Actions, the Partnership asserts a number of defenses and counterclaims that it argues preclude the relief sought by Williams. Notably, the Partnership argues that Latham's independent conclusion that it is unable to deliver the 721 Opinion precludes specific performance of the Merger Agreement. In addition, the Partnership argues that Williams is not entitled to specific performance of the Merger Agreement because Williams has breached numerous provisions of the Merger Agreement. Among other alleged breaches, the Partnership argues that Williams breached the Merger Agreement by failing to ensure that the S-4 is accurate. According to the Partnership, it is therefore allowed to terminate the Merger Agreement.

In relief, the Defendants seek a judgment denying Williams any recovery in the First and Second Actions. In addition, the Defendants seek a declaration that Williams breached the Merger Agreement; that the Partnership did not breach the Merger Agreement; and that the Defendants may terminate the Merger Agreement without any liability to Williams. Finally, the Partnership seeks a judgment

29

awarding the Defendants their reasonable costs and expenses incurred in this litigation.

*B. The 721 Opinion*

### 1. The 721 Opinion Condition Precedent

A condition precedent to the Merger closing is that Latham issue a finding that, in its opinion, the contemplated transfer of the Williams Assets between ETC and the Partnership, which I refer to as the "Contribution Transaction," "*should be*" considered a tax-free transfer under Section 721(a). Thus far, Latham has made it clear that it is unable to issue such an opinion. While the 721 Opinion need not be issued as a condition precedent until the time of closing—which is bound by the Outside Date of June 28, 2016—and while other conditions necessary for the Proposed Transaction to close, such as an affirmative vote of the Williams' stockholders,[105] have yet to occur, both parties seek a declaratory judgment. Under the terms of the Merger Agreement, if Latham is unable to issue the 721 Opinion, either party may avoid the contract. Williams asks that I issue a declaratory judgment that the Partnership is estopped from exercising this right, assuming Latham remains unable to issue the 721 Opinion, because the Partnership has materially breached a contractual obligation to use "commercially reasonable

---

[105] The vote of the Williams' stockholders is scheduled for June 27, 2016 as of the date of this Memorandum Opinion.

efforts" to obtain the 721 Opinion from Latham. The Partnership seeks the opposite declaration.

### 2. Latham's Actions

Before addressing the issue of the Partnership's efforts, given the allegations at trial, it is appropriate to consider whether Latham has determined in good faith that it is unable to issue the 721 Opinion. Williams made it clear at trial that it contends that Latham reached a conclusion that it could not issue the 721 Opinion for reasons other than its best legal judgment—that is, that Latham acted in bad faith. After addressing that issue, I will turn to the issue of whether the Partnership is in material breach of the commercially reasonable efforts provisions.

I start with examining some propositions necessary to my analysis. First, the sophisticated parties who drafted the Merger Agreement both wanted this deal to be consummated at the time they executed the agreement. The Merger Agreement makes it clear, however, that a tax-free transfer of the Williams Assets between ETC and the Partnership was necessary for the deal to make economic sense at the time of signing. Therefore, and despite both sides believing that such a tax-free transfer was possible, they conditioned consummation of the deal on the opinion of a third party—Latham—that the transaction "should" survive an IRS challenge and be

considered tax free under Section 721(a).[106]

A "should" decision is a term of art in the tax-law field.[107] Tax opinions of this kind can be given to a variety of standards: "more likely than not"—meaning that there is at least a 51% chance that the tax opinion rendered will be upheld; "should"—meaning that it is quite likely that the decision will be upheld; and "will"—meaning that the opinion is virtually certain to be upheld.[108] Timothy Fenn testified that in Latham's view, a "should-level opinion is something with substantial certainty as to the effect. In other words, there is very good case law. There may be some contrary authorities, but it is readily distinguishable."[109] The parties could have contracted to a different level of certainty for the condition-precedent 721 Opinion. They could have picked an independent third party to make such a determination, such as an academic. They could have opted for an objective standard, to be provided by a court or by an arbitrator. Instead, they assigned responsibility to Latham, the Partnership's tax counsel, and determined that a condition precedent to consummation of the Proposed Transaction would be *Latham's* opinion that the transfer "should" withstand a challenge to tax-free status

---

[106] Andrew Needham from Cravath made it clear that the purpose of a "should" opinion is to opine on the likelihood that a transaction will survive an IRS challenge; it is assumed that the IRS will audit the transaction. Trial Tr. 352:13–20 (Needham). The likelihood that the IRS will in fact challenge the transaction is irrelevant to that determination. *Id.*

[107] *See id.* at 210:16–211:3 (Fenn); *id.* at 344:8–24 (Needham).

[108] *See id.* at 211:4–212:8 (Fenn).

[109] *Id.* at 211:19–23 (Fenn).

under Section 721(a). Therefore, it is Latham's subjective good-faith determination that is the condition precedent. As a result, it is not appropriate for me to substitute my judgment on the Section 721(a) issue for that of Latham; my role is to determine whether Latham's refusal, thus far, to issue a "should" opinion is in good faith, that is, based on Latham's independent expertise as applied to the facts of the transaction.

Next, I note the truism that lawyers tend to be responsive to the interests of their clients. Latham was expected by both parties to be able to issue the 721 Opinion, and itself believed it could do so at the time it first analyzed the Proposed Transaction; it is only *after* the economics of the deal changed significantly and the Partnership was manifestly interested in a low-cost exit from the Merger Agreement that Latham determined that it was unable to issue the 721 Opinion. That circumstance may be coincidental or it may be determinative; in any case, as a finder of fact, I must look at this decision with a somewhat jaundiced eye.

Finally, and contrary to the foregoing, I note that Latham is a law firm of national and international repute, that its interests are larger than those of this particular representation, and that its reputation and that of the lawyers involved are at risk here. It is, at the least, a blow to the reputation of the firm and its tax partners, in a case where they had preliminarily advised that the deal would qualify for a certain tax treatment, to have to backtrack in a way that causes that deal to come a cropper. The parties to mergers are typically looking, not for escape hatches, but for

33

certainty that their agreement will be consummated, and to that end they hire counsel for assistance. In other words, it is against Latham's reputational interest going forward to have reached the conclusion at which it has arrived.

With all these interests in mind, I turn now to the facts. In March of 2016, Whitehurst, the Partnership's Head of Tax, was considering the deal, and specifically, the Contribution and Cash Transactions, in light of what he testified was his epiphany that, while the $6 billion transfer to ETC was a fixed amount in the Merger Agreement, the value of the assets transferred back to the Partnership—stock in ETC tied to the value of the Partnership units—had dropped precipitously. He became concerned that this might be an indication that the cash component of the Cash Transaction, in conjunction with the Williams Assets transferred in the Contribution Transaction, might be considered a transfer of assets for cash, in which case it could trigger a tax liability.

I note that Whitehurst's epiphany, if such it was, was reached in a context where the deal no longer made economic sense to the Partnership, and by which time the Partnership was clearly in search of a soft exit from the Merger Agreement. Nonetheless, Whitehurst testified that his realization about the perceived tax problems arose while researching ways in which the Partnership could address the deterioration of the energy market, such as cutting distributions; that is, it was not manufactured to avoid the Proposed Transaction. Williams contends that this

34

testimony is mendacious. I address this consideration in light of the Partnership's compliance with the "commercially reasonable efforts" clause, below, but in terms of Latham's analysis, I do not need to resolve the issue of Whitehurst's motivation.

Whitehurst contacted Timothy Fenn at Latham on March 29, 2016, and asked Latham to address his concerns. He did not direct Latham to come to a particular conclusion. Latham agreed to analyze the transfer between ETC and the Partnership, and the tax consequences thereof, in light of the change in value of the Hook Stock

A period of intense scrutiny of the deal and its implications followed in the Latham tax department. Because I need not address objectively whether the deal qualifies for tax avoidance under Section 721(a), I will address the considerations in simplified form. Two exchanges—as the parties have formulated them for analysis for tax purposes—are contemplated between ETC and the Partnership under the Merger Agreement. In the first and most basic, the Williams Assets are transferred to the Partnership in return for Partnership units—the Contribution Transaction. Under Section 721(a), a contribution of property for an interest in a partnership is not a tax triggering event.

The deal also contemplated a second exchange, however. The Partnership is to transfer $6 billion in cash in return for which shares of ETC—tied one-for-one in value to Partnership units—would be transferred back to the Partnership—the Cash Transaction. This second exchange was structured, as of the time the Merger

Agreement was executed, as a value-for-value exchange: $6 billion in cash was to be transferred to ETC, and ETC stock—valued by the publicly traded Partnership units—worth $6 billion was transferred back to the Partnership.

While the testimony was not consistent among the witnesses as to the reasons for the Cash Transaction, I make the following findings based on the testimony, by a preponderance of the evidence. Williams wished to negotiate a cash component to the deal to allow a distribution of cash, in addition to stock representing Partnership units, to Williams' stockholders as consideration for the Proposed Transaction. In order to satisfy this desire but also maintain the likelihood that the Contribution Transaction would receive tax-free status, Whitehurst determined that ETC should transfer ETC stock—the Hook Stock—valued by equivalence to Partnership units at $6 billion, to the Partnership, in return for the $6 billion in cash that ETC would receive from the Partnership. This cash consideration, along with ETC stock valued one-to-one with the Partnership units, would be distributed to the former Williams stockholders, and ETC would hold Partnership units as its only asset. While I find that the initial reason for the Cash Transaction, at least according to Whitehurst, was to add cash to the transaction and avoid tax liability,[110] it was

---

[110] Whitehurst testified that the genesis of the Hook Stock was the "tax team's idea" to "avoid a disguised sale." *Id.* at 147:9–11, 148:13–16 (Whitehurst). Alison Preiss of Wachtell testified that the Partnership initially proposed the Hook Stock as "the mechanism by which we would get the $6 billion of cash to Williams stockholders." *Id.* at 311:2–12 (Preiss).

supported by both parties for another reason: it aligned interests between the Partnership and ETC, because after consummation of the Proposed Transaction, the Partnership would be a 19% holder—that is, the largest single stockholder—in ETC.[111] Actions taken by the Partnership, therefore, would likely be consistent with the interests of ETC and its stockholders as well.

Should a tax authority determine that the cash component of the merger consideration was being paid to ETC as partial payment for the Williams Assets being transferred to the Partnership, the Contribution Transaction could be treated as a sale of assets, which would trigger tax liability.[112] While the potential tax liability is based on factors undisclosed in the record, testimony indicates it has been estimated in the range of $1 billion.[113] According to Whitehurst, it was not until March 2016 that he realized that the drop in the value of Partnership units—which in turn would determine the value of shares of ETC stock, a fixed number of which were to be transferred to the Partnership in return for $6 billion under the Merger Agreement—meant that the Cash Transaction represented a payment of $6 billion to ETC for between $2 and $3 billion worth of stock. Because of this discrepancy, it occurred to Whitehurst that the tax authorities might consider the $3 to $4 billion overpayment part of a hidden sale of assets for cash, triggering tax liability. This

---

[111] *See id.* at 7:24–8:7 (MacInnis); *id.* at 47:1–13 (Van Ngo); *id.* at 104:19–106:6 (Welch).
[112] See Section 707 and the related regulations.
[113] *Id.* at 88:2–12 (Van Ngo).

was the proposition with which Latham was faced after Whitehurst spoke to Timothy Fenn, when Latham began to reconsider whether it could issue the 721 Opinion in light of these circumstances.

The testimony indicates to me that Latham took this responsibility seriously. It devoted considerable effort in this endeavor, ultimately investing over 1,000 hours of attorney time in the process.[114] It marshalled its tax attorneys and extensively analyzed the regulations and case law regarding the issue. Latham reached the following conclusion: There was some risk as the deal was initially constituted that, given the cash component of the transfers between ETC and the Partnership, tax authorities could consider this a hidden transaction for cash, triggering tax liability. Nonetheless, given that at the time the deal was struck, the Cash Transaction involved assets of equivalent value, Latham was able, under those conditions, to issue an opinion that the transaction should be considered a tax-free event. However, the large drop in the value of Partnership units, coupled with the fixed nature of the $6 billion cash transfer, meant that the Cash Transaction resulted in a value discrepancy amounting to a $3 to $4 billion overpayment by the Partnership for the Hook Stock. Because the cash payment remained fixed, and the number of shares of Hook Stock remained fixed, while the value of those shares based on Partnership units fluctuated, Latham referred to this as the "perfect hedge." Under this analysis,

---

[114] *Id.* at 278:11–14 (Fenn).

38

Latham became concerned that this large overpayment would be regarded by tax authorities as a cash component of the transfer of Williams Assets to the Partnership, triggering tax. Therefore, it concluded, and remains convinced, that it is unable to opine that the Contribution Transaction results in a tax free transfer of assets under Section 721(a).

The tax lawyers at Morgan Lewis, hired by the Partnership to analyze the same situation, came to a similar conclusion based on a somewhat different premise; Bill McKee of Morgan Lewis testified that in the opinion of his firm, even if the Cash Transaction was for assets of equivalent value, the tax authorities would be sufficiently likely to consider the cash component of the overall asset transfer between ETC and the Partnership as a hidden asset purchase, so that his firm could not have issued an opinion that the transfer "should" be tax free. In other words, a non-trivial risk exists that the tax authorities would look at both "legs" as a single transaction. In addition, the Partnership's expert, Professor Ethan Yale, reached a similar conclusion and explained that the Proposed Transaction was flawed from inception.[115] He also opined that the process used by Latham to reach its decision examined the appropriate case law and statutory and regulatory law, in full; gave a balanced review of these authorities in light of the facts of the case; and was overall

---

[115] *Id.* at 560:23–561:9 (Yale).

reasonable.[116]

Williams argues, to the contrary, that Latham's refusal to issue the 721 Opinion is in bad faith, and reflects the interests of Latham's client and not its actual opinion. It deprecates the value of the opinion of Morgan Lewis by noting that Whitehurst and McKee were formerly colleagues and that McKee considers himself a mentor to Whitehurst. It relies on the opinion of its tax advisor—tax attorneys at Cravath—and its expert—Professor Howard Abrams—to assert that ETC is merely a conduit for the passage of cash to Williams' stockholders, that tax authorities would so regard it, and that the Contribution Transaction thus should be deemed tax free.[117] Professor Abrams went so far as to testify that no reasonable tax attorney could opine otherwise, and that therefore Latham must be acting in bad faith, suppressing its true opinion.[118] I find otherwise.

I first note that this is an "unusual, perhaps unique" transaction.[119] The witnesses largely agree that there is therefore little persuasive authority in the case

---

[116] *Id.* at 551:18–552:14 (Yale).

[117] *See id.* at 373:13–21 (Needham); *id.* at 427:5–18 (Abrams).

[118] In furtherance of Mr. Abrams testimony, Williams goes to great lengths in its post-trial briefing to disprove Latham's "perfect hedge" theory. The Plaintiff asserts that the theory is "unreasonable," and argues that it is a "tautology" based on the way the argument assumes the conclusion it purports to demonstrate—referring to the fact that the "perfect hedge" model backs into the value of the Williams Assets by assuming that the total consideration on both legs is equal. *See* Pl's Proposed Findings of Fact ¶¶ 121–22. Likewise, Professor Abrams testified that "the perfect hedge argument is so far beyond the pale, no serious lawyer could advance it." Trial Tr. 449:6–11 (Abrams).

[119] *Id.* at 554:2–6 (Yale); *id.* at 382:12–383:10 (Needham).

law regarding anticipated perception by tax authorities of this complicated transfer. Second, I note the following opinions have been reached: Professor Abrams believes that no reasonable tax attorney could agree with Latham's conclusion, to the extent its conclusion is based on the "perfect hedge" theory—thus Abram's position resembles a "will" opinion; Cravath believes that the Contribution Transaction is likely tax free and could issue a "should" opinion, but appears to be unwilling to issue a "will" opinion; Gibson—on behalf of Williams—looked at the issue and initially stated that it would be "difficult to get to should," but eventually stated that it could issue a "weak-should" opinion; Latham believes that the Contribution Transaction was initially tax free as of the date of the Merger Agreement, but now believes that, due to the significant decline in the value of Partnership units, there is a sufficient likelihood that the Contribution Transaction is not tax free such that a "should" opinion is inappropriate; Morgan Lewis, for reasons different than those identified by Latham, concluded that a "should" opinion is inappropriate—namely, that because there is a sufficient likelihood that the Contribution Transaction is not now, nor was it ever, tax free; and, finally, Professor Yale believes that, for reasons similar to that of Latham, a "should" opinion is not appropriate, finding that there is a sufficient likelihood the Contribution Transaction is not, nor was it ever, tax free. This range of opinion indicates to me the closeness of the issue and the unusual nature of the transaction here.

Finally, I credit the testimony of Timothy Fenn and Laurence Stein, tax partners at Latham, who were obviously embarrassed that they had missed this issue earlier in the history of this proposed transaction. Particularly convincing was the testimony of Stein, who testified forcefully that his firm's opinion was not influenced by the (concededly manifest) interests of its client, the Partnership.[120] I credit this testimony as truthful based on the demeanor of the witness, and this belief is buttressed by the fact that Latham reversing itself in the manner it has is not in the reputational interest of the individual tax attorneys at Latham, nor the interest of the firm generally.[121] It is, in fact, a substantial embarrassment to Latham and its tax partners. In other words, I believe Stein's testimony regarding his and his associates' personal integrity in this matter. I also note that reputational effects[122] surely outweigh any benefit of an unethical deference to the interests of the Partnership: while this deal is, certainly, a lunker, Latham has even bigger fish to fry.

To recapitulate, Williams' conclusion the Latham has acted in bad faith relies

---

[120] *See id.* at 475:12–20 ("Look, this is our opinion, our reputation. I've been in this firm 30 years. I chaired this tax department for 11 years. I've watched this firm grow. I've watched this tax department, with my fingerprints on it, grow. I have a lot of pride in our integrity and in our professional ability. And I – there's not for any client, I'm going to reach a conclusion that is contrary to my professional judgment. Not a chance.").

[121] The testimony of Messrs. Fenn and Stein is further bolstered by the fact that in a previous dispute between Latham and Cravath regarding the applicability of Section 368—a dispute that arose after the Partnership concluded that the Proposed Transaction was untenable—the two firms were nonetheless able to work through the issue and come to an agreement.

[122] I note that the reputational effects are already being made manifest, based on the public trial in this matter. *See* Ronald Barusch, *Dealpolitik: One Clear Loser From ETE/Williams Fight Is Latham & Watkins*, Wall St. J. (June 23, 2016, 3:46 PM), http://blogs.wsj.com/moneybeat/2016/06/23/dealpolitik-one-clear-loser-from-etewilliams-fight-is-latham-watkins/.

on two factual allegations and a deduction. The first fact is undisputed: the Partnership wants an out from the Proposed Transaction. The second factual allegation is disputed: that no reasonable tax attorney could reach the conclusion Latham reached. Williams deduces from these facts that Latham must, therefore, be acting at the direction of, or on behalf of, the Partnership, and not based on its independent conclusion, in failing to issue the Opinion, *res ipsa loquitur*. They rely on this deduction because the record is bereft of any explicit or implicit direction by the Partnership to Latham to reach a particular outcome. Despite Latham's obvious knowledge that its client would like to exit the deal, I reject Williams' conclusion for the reasons above. I find based on the evidence that Latham has reached its conclusion based upon its independent judgement.

After reaching a determination that it could not issue the 721 Opinion, Latham communicated this fact to Williams' deal counsel at Cravath. Cravath indicated forcefully to Latham its belief that the tax issue was bogus, and the matter immediately became potentially litigious. Nonetheless, Cravath came up with two proposed "solutions" for the potential that the structure of the deal, as agreed to, would lead to tax authorities considering the Contribution Transaction as a taxable event. At trial, the parties concentrated on "Proposal A," under which the deal would be restructured. Proposal A envisioned a modification of the Merger Agreement calling for creation of a new ephemeral entity to receive the cash payment and

43

distribute it to Williams' shareholders, which entity would then be dissolved. According to attorneys at Cravath, this structure would insulate ETC from the cash payment, and tax authorities would thus not consider the asset exchange between ETC and the Partnership as a hidden transaction for cash.[123] The parties here agree that Proposal A, while it would employ a different structure, would have the same economic result as the Proposed Transaction.

Latham responded to Proposal A by stating that it did not need to evaluate a restructured deal under the Merger Agreement; it nonetheless considered this proposal (along with "Proposal B," which had a somewhat different structure) and determined that, under the doctrine announced in *Commissioner v. Court Holding Co.*,[124] tax authorities would disregard this late modification to the deal, and that it would be unable to issue the 721 Opinion even if either proposal were in place.[125] For the reasons above, I find that this determination was in good faith.

That finding is bolstered by the testimony of Williams' own tax expert, Professor Abrams, who testified that such a modified transaction with an ephemeral entity would be viewed by tax authorities as though the modification did not exist;[126] tax authorities would evaluate for tax purposes, therefore, the original and

---

[123] Trial Tr. 364:9–365:6 (Needham).
[124] 324 U.S. 331 (1945).
[125] Trial Tr. 268:23–269:10 (Fenn).
[126] *Id.* at 433:9–434:7 (Abrams).

underlying deal (which according to Professor Abrams was tax free in any event). In other words, according to Professor Abrams, Proposal A would be a nullity.

Having found that Latham has in good faith determined that it cannot issue an opinion that the Contribution Transaction should qualify as tax free under Section 721(a), I also find that, as of today, a condition precedent for the consummation of the Merger has not been met. I turn, therefore, to Williams' argument that the Partnership should be estopped from exercising its resulting right to terminate the Merger, because it is in material breach of its obligation to use commercially reasonable efforts to obtain a 721 Opinion from Latham.

### 3. The Partnership is Not in Material Breach of the Cooperation Provision

The Partnership was contractually obligated to use commercially reasonable efforts to obtain the 721 Opinion from Latham.[127] Williams argues that the Partnership is in material breach of that contractual provision, and that, therefore, it should be estopped from exercising its contractual right to terminate the Merger Agreement if, as appears virtually certain, Latham is unable to issue the 721 Opinion at the time of closing. Upon a review of the evidence, I conclude that the Partnership is not in material breach.

"Commercially reasonable efforts" is a term not defined in the Merger

---

[127] *See* Merger Agreement § 5.07(b).

45

Agreement. The term is not addressed with particular coherence in our case law. In *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*,[128] this Court equated "reasonable best efforts"—a similar term also used in the Merger Agreement—with good faith in the context of the contract at issue.[129] I find that, by agreeing to make "commercially reasonable efforts" to achieve the 721 Opinion, the Partnership necessarily submitted itself to an objective standard—that is, it bound itself to do those things objectively reasonable to produce the desired 721 Opinion, in the context of the agreement reached by the parties.

Williams argues strenuously that the Partnership was desperate to avoid a deal that no longer made financial sense, and acted in such a way as to preclude Latham from rendering the 721 Opinion. I have no doubt that the Partnership, in light of the fixed-cash component of the purchase price and the decline in both the value of its units and the value of the Williams Assets given the poor performance of the energy sector of the economy, experienced a bitter buyer's remorse. It was nonetheless charged with reasonable behavior designed to allow Latham to give the 721 Opinion. Williams argues that, as a result of its current incentives, the Partnership was willing to use methods fair or foul to avoid the Proposed Transaction. Even if I accept this as true, however, Williams can point to no commercially reasonable efforts that the

---

[128] 965 A.2d 715 (Del. 2008).
[129] *Id.* at 755–56.

46

Partnership could have taken to consummate the Proposed Transaction; specifically, in this context, actions available to the Partnership that would have caused Latham, acting in good faith, to issue the 721 Opinion. The record demonstrates no such actions available to the Partnership.[130] Therefore, despite the motivations of the Partnership, I cannot find a material breach under the facts before me.

To the extent that Williams points to the actions of Whitehurst in placing the issue—the potential that the excess cash generated by the Cash Transaction might cause tax authorities to treat the Contribution Transaction as a taxable event—before Latham, I find that simply bringing the issue to Latham's attention is not a violation of the "commercial reasonable efforts" clause. To the extent that issue was, as Williams puts it, a "bogus" grasping at straws by Whitehurst and the Partnership, desperate to avoid the deal, Latham was free to respond that the issue did not change

---

[130] Williams appears, in post-trial briefing, to argue that the burden is on *the Partnership* to demonstrate a negative—that its lack of more forceful action after discovering the Section 721(a) problem did *not* cause Latham's inability to render the 721 Opinion. Williams cites this Court's decision in *WaveDivision Holdings, LLC v. Millennium Digital Media Sys., LLC*, 2010 WL 3706624 (Del. Ch. Sept. 17, 2010) for the proposition that "[i]t is an established principle of contract law that where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused," and that "once it has been determined that [a defendant] breached [the contract], the burden of showing that breach did not materially contribute to [failure of the condition] is properly placed on [the defendant]." Id., at *14, *15 (internal quotations omitted). This is unremarkable; once a plaintiff has demonstrated a breach leading to adverse consequences, it is an affirmative defense that the consequences were otherwise unavoidable. The problem for Williams is that the record is barren of any indication that the action or inaction of the Partnership (other than simply drawing Latham's attention to the problem) contributed materially to Latham's inability to issue the 721 Opinion. This is true regardless of whether the Partnership's actions were commercially reasonable. In other words, no matter how I allocate the burden of proof, the result is the same.

47

its opinion with respect to the 721 Opinion. I have already found that Latham, in good faith, made the determination that it cannot issue the 721 Opinion in light of the current structure of the Proposed Transaction, nor any alternative structure suggested to date. To the extent Williams is arguing that, by bringing the issue to Latham's attention, the Partnership was making a veiled suggestion that Latham prostitute itself in the service of avoidance of the Proposed Transaction, I have already found that such a suggestion was not Latham's motivation. Latham sincerely believes it cannot issue the 721 Opinion. Therefore, even if such a veiled suggestion was made (an issue on which I need not opine) it could not have been a material breach because Latham did not act thereon.

Williams argues specifically that in rejecting Proposals A and B, the Partnership acted in a way that was not commercially reasonable; the Partnership for its part argues that "commercially reasonable" efforts cannot extend to a restructuring of the deal itself, and therefore that it was under no such obligation. I need not resolve this issue because, as noted above, Latham evaluated Proposals A and B and determined that pursuing them would not allow it to issue the 721 Opinion. In other words, the Partnership's failure (if failure it was) to negotiate a change to the Merger Agreement to implement the Proposals had no material effect on the failure of the condition precedent, obtaining the 721 Opinion. Williams has not pointed to other facts which the Partnership withheld from or misrepresented to

48

Latham that have caused it to withhold the 721 Opinion. There is simply nothing that indicates to me that the Partnership has manipulated the knowledge or ability of Latham to render the 721 Opinion, or failed to fully inform Latham, or do anything else, whether or not commercially reasonable, to obstruct Latham's issuance of the condition-precedent 721 Opinion, or that had a material effect on Latham's decision. Therefore, I have no basis to find that the Partnership is in material breach of the commercially reasonable efforts requirement, and estoppel is not a remedy available to Williams here.

I note that, in post-trial briefing, Williams does not point to any direct evidence the Partnership instructed Latham, directly or indirectly, to fail to satisfy the condition precedent. Williams does make much of the fact that the Partnership did not direct Latham to engage earlier or more fully with Williams' counsel, failed itself to negotiate the issue with directly with Williams, failed to coordinate a response among the various players, went public with the information that Latham had declined to issue the 721 Opinion,[131] and generally did not act like an

---

[131] Williams argues that the public announcement concerning Latham's inability to issue the 721 Opinion "boxed Latham in," meaning that the announcement would have increased Latham's embarrassment had it again changed its mind and decided to issue the 721 Opinion. Latham, however, had already tried to find a way to issue the opinion, and, as I have explained, understood that its inability to do so will cause it substantial reputational harm. The record demonstrates that public disclosure did not influence Latham's decision, which was firm prior to the public disclosure. Rather, Williams' argument is clearly influenced by the fact that the court in *Hexion*, discussed *infra*, found that such a public announcement of insolvency had the material effect there of driving third-party lenders out of the market to finance the merger, an entirely different circumstance than that presented here.

enthusiastic partner in pursuit of consummation of the Proposed Transaction. True. The missing piece of Williams' syllogism is any demonstration that the Partnership's' activity or lack thereof caused, or had a material effect upon,[132] Latham's current inability to issue the 721 Opinion.

Williams, in arguing that the Partnership has materially breached its "commercially reasonable efforts" obligations, relies heavily on *Hexion*. The facts in *Hexion*, a decision of this Court, are superficially similar to but materially distinguishable from those here. In *Hexion*, as here, the buyer was an ardent suitor, and it entered a seller-friendly contract without a financing or solvency out. Also as here, its ardor cooled and it developed buyer's remorse. The factual similarity then ends. Notwithstanding the lack of financing and insolvency outs, the buyer in *Hexion* hired an advisor on insolvency, knowingly fed the advisor misleading or inaccurate information, and received thereby an opinion that the combined entity would be insolvent. The buyer was then "clearly obligated" under the contract to discuss the situation with the seller, which obligation it breached, although it appears that buyer and seller could have taken steps to avoid the insolvency. Instead, with the insolvency opinion as a bludgeon, the buyer took affirmative steps to scuttle its financing. The buyer then argued that it had suffered a "material adverse change,"

---

[132] *See WaveDivision Holdings*, 2010 WL 3706624, at *14 (holding that liability may be premised where the defendant's breach by nonperformance contributes materially to the failure of the goal to which the "efforts" clause was directed).

50

and should be able to avoid the merger; or at any rate, that it was not in knowing and intentional breach of the merger agreement, and thus that its liability for damages to the seller was contractually limited. The court found, among much else, that the buyer had breached its obligation to use "reasonable best efforts" to obtain financing.

Like this case, perhaps, the *Hexion* buyer had an incentive to avoid the merger. Unlike the record in this case, in *Hexion* the buyer actively and affirmatively torpedoed its ability to finance. If the record here reflected affirmative acts by the Partnership to coerce or mislead Latham, by which actions it prevented issuance of the 721 Opinion, the facts here would more resemble *Hexion*, and the outcome here would likely be different. I do not find my decision in conflict with *Hexion*, however, given the record created at trial.[133]

### 4. The Partnership is Not in Material Breach of its Representation and Warranty

Williams makes an argument that the Partnership is "in breach" of a required

---

[133] Similarly, Williams cites to this Court's analysis in *WaveDivision Holdings*. In *Wave Division Holdings*, the defendant buyer entered into an asset purchase agreement with the plaintiff seller, which required the buyer to exercise "commercially reasonable efforts" to obtain certain consents to the asset purchase from the buyer's secured creditors and certain of its noteholders. Instead of making such efforts, the buyer secretly engaged in dual-track negotiations, simultaneously pursuing the asset purchase with the plaintiff while also engaging in conversations regarding a possible refinancing of the buyer's debt with the secured creditors and noteholders, the very parties whose consent the consummation of the asset purchase agreement relied upon. These scenarios were mutually exclusive. As in *Hexion*, the Court found that the buyer took affirmative steps, in violation of the relevant cooperation clause, to thwart a condition to close. *See id.* at \*18 (finding that the defendant buyer "spent most of its energy and resources helping to develop an alternative to the [purchase], efforts designed to thwart, not obtain, consent" of the secured creditors and noteholders).

representation and warranty that, as of the date the Merger Agreement was signed, it knew of no actions or facts indicating the 721 Opinion could not issue. To my mind, this is more properly considered a misrepresentation, rather than a breach, to the extent it exists. Nonetheless, I find no misrepresentation or breach here.

The Partnership and ETC made the following representation in the Merger Agreement:

> None of [ETC], [Partnership], or any Subsidiaries of [Partnership] has taken or agreed to take any action or knows of the existence of any fact that would reasonably be expected to prevent . . . (B) the Contribution and Parent Class E Issuance from qualifying as an exchange to which Section721(a) of the Code applies.[134]

The purpose of such a provision is that all sides can be fully informed as of the time the agreement is reached. There are no facts here that the Partnership failed to disclose. Both the Partnership and Williams understood all the facts at issue: that the Merger Agreement contemplated an exchange between ETC and the Partnership in which the Partnership would transfer $6 billion in cash and Class E Units to ETC, and ETC would transfer the Hook Stock and the Williams Assets to the Partnership.

Williams' real complaint is that the representation did not disclose Latham's recently developed analysis of that transaction, made in light of an ever-fluctuating market in Partnership units, that there is sufficient risk that the transaction does not qualify as tax free under Section 721(a), such that it cannot deliver the 721 Opinion.

---

[134] Merger Agreement § 3.02(n)(i).

That analysis is not a "fact" requiring disclosure under the Merger Agreement. It is a theory of tax liability. Moreover, the parties explicitly contemplated the tax issue under Section 721(a) and provided that a determination must be reached by Latham, as a condition precedent to the consummation of the Proposed Transaction, that the Partnership Transaction should be tax free. There is simply no misrepresentation of fact inherent in the Partnership's representation. Even if the legal theory on which Latham now bases its decision not to issue a 721 Opinion were a "fact" that the Partnership was required to disclose in the representations and warranties, to the extent it was aware of it as of the date of the representation, nothing in the record indicates to me that this legal theory was developed at the time of signing.

Whitehurst testified that he was confused about the fixed nature of the number of ETC shares that would be exchanged for $6 billion in the transaction, and that once he realized such was the case, he became concerned that the transaction might not qualify as tax free. According to the Partnership, this epiphany occurred in March 2016, and was the first time Whitehurst, the Head of Tax, considered this aspect of the Section 721(a) problem. Williams' theory, by contrast, seems to be that, notwithstanding this testimony, Whitehurst manufactured this issue in a desperate attempt to find a way to avoid the Proposed Transaction after conditions changed and the transaction became financially unpalatable. I need not decide between these two theories, neither of which is compatible with a finding that the

Partnership knowingly breached a representation and warranty. What would stain credulity, to my mind, would be a finding that the Partnership had this theory in mind *at the time it entered the transaction and made the representation*, and yet held it back. The Partnership's interest at that time was in consummation of this transaction; it had pursued the transaction fervently and, as conditions then existed, believed the transaction to be strongly in the Partnership's interest. There is no indication that it was nonetheless interested in preserving an escape hatch through which *either party* could exit the transaction.

Williams argues that the tax theory now embraced by Latham should have been objectively obvious, and thus the Partnership should be charged with knowledge and a duty to disclose under the representations and warranties provisions. In other words, a reasonable party in the Partnership's shoes charged with knowledge of the facts was required to disclose that tax authorities might contemplate the Cash and Contribution Transactions, collectively, as involving cash-for-assets, thus making Latham's provision of the 721 Opinion unlikely. This proves too much, to my mind: knowledge of such a theory is no more chargeable to the Partnership than to Williams. I note that Latham's 721 Opinion is a *mutual* condition precedent.[135] Williams views the Partnership's representation that it was not aware of actions or facts that would cause liability under Section 721(a) as though it were

---

[135] *Id.* § 6.01(h).

a waiver of any subsequent reliance of a failure of the 721 Opinion condition precedent. If so, the provision for a 721 Opinion would be surplussage, and I reject that reading.[136] Therefore, I conclude that the Partnership is not in breach of its representations and warranties.

*C. The Special Issuance*

Williams asserts that the Partnership's Special Issuance, completed March 8, 2016, breaches the Merger Agreement's mandate that the Partnership carry on its business in the normal course of business. Section 4.01(b) that provides that "[e]xcept as set forth in Section 4.01(b) of the Parent Disclosure Letter . . . during the period from the date of this Agreement to the Effective Time, [the Partnership] shall, and shall cause each of its Subsidiaries to, carry on its business in the ordinary course."[137] Among other things, Williams seeks an injunction to unwind the Special Issuance.

The Partnership asserts that the Special Issuance does not breach the Merger Agreement because it falls within an exception within Section 4.01(b) of the Parent Disclosure Letter. Among other things, the Partnership seeks an order declaring that

---

[136] The parties could have structured their agreement differently, of course. They could have, for instance, eliminated the 721 Opinion as a condition precedent, instead relying on a binding tax review as of the time of signing. The could have limited the condition precedent to application only where a change in tax law occurred, or where other designated circumstances changed, or otherwise placed limitations on the parties' right to terminate the agreement based on potential tax liability.

[137] Merger Agreement § 4.01(b).

the Special Issuance does not breach the Merger Agreement.

Permanent injunctive relief of the kind sought here—rescinding a transaction—is a matter of equity. To demonstrate entitlement to such relief, a plaintiff must establish both equitable and legal grounds exist: it must demonstrate actual success on the merits of its claim; that it will suffer future irreparable injury absent the relief requested; and, in addition, that equity supports the relief.[138]

Williams argues that the evidence regarding the Special Issuance demonstrates not only that the Partnership is in breach of the Merger Agreement, but also that the Convertible Units were issued to favor certain unitholders of the Partnership to the detriment of the Partnership and its common unitholders. Williams makes a substantial argument that, at the least, the Special Issuance is detrimental to the interests of non-subscriber holders of Partnership equity— including Williams stockholders whose stock interests would be tied to such equity were the Merger to close—for the benefit of the insiders who were able to subscribe. Nonetheless, I find fatal to Williams' request for injunctive relief at this stage of the proceedings the lack of risk that Williams or its stockholders will suffer irreparable harm absent an injunction ordering rescission, given my decision that a condition precedent to the Merger Agreement has failed. Williams argues that the Special

---

[138] *E.g. Draper Coomc'ns, Inc. v. Delaware Valley Broads. L.P.*, 550 A.2d 1283, 1288 (Del. Ch. 1985) (citations omitted).

Issuance threatens its stockholders with irreparable harm, in that they will not receive the benefit of their full Merger bargain, will be diluted as indirect holders of Partnership equity, and that ETC will be unable or unwilling to seek relief, post-Merger. If the Special Issuance is a breach of the Merger Agreement, in other words, it does not threaten irreparable harm *absent consummation of the Merger*. In light of my decision regarding the 721 Opinion, however, the Partnership's right to terminate the Merger Agreement is preserved. Latham has indicated that it will be unable to deliver the 721 Opinion on the closing date, creating a near certainty that the Partnership will terminate the Merger Agreement. In such a case, Williams' stockholders will not become indirect Partnership equity holders, and Williams' interest in the Special Issuance post-merger will be moot.

Since this decision only considers Williams' request for injunctive relief, I will not consider the Special Issuance further here. Nothing in this Memorandum Opinion should be read to prevent Williams from arguing that the Partnership is in breach with regard to the Special Issuance, should the issue be relevant to further proceedings in the matter.

### D. The Counterclaims

The Defendants have alleged several defenses and counterclaims, including a disclosure claim. The Partnership has conceded that, should I find that a condition precedent to the Proposed Transaction has failed, I need not address its

57

counterclaims, including its allegation that Williams has breached the Merger Agreement by failing to make material disclosures in proxy materials given to its stockholders in connection with a vote on the Merger Agreement. In light of my conclusions above, I therefore decline to address the Defendants' Counterclaims.

### III. CONCLUSION

For all the reasons stated above, I find that Williams' request to enjoin the Partnership from terminating the Merger based on the presumptive failure of the Section 721(a) condition precedent is denied, and that the Partnership's request for a declaration of that finding is granted. In the interest of an expedited appeal, if such is sought, I have attached an Order to that effect. The parties may seek modification of that Order, as appropriate.

# THE COURT OF CHANCERY OF THE STATE OF DELAWARE

THE WILLIAMS COMPANIES, INC., )
                                )
        Plaintiff and            )
        Counterclaim Defendant,  )
                                  )
      v.                       ) C.A. No. 12168-VCG
                                  )
ENERGY TRANSFER EQUITY, L.P. )
and LE GP, LLC, )
                                  )
        Defendants and      )
        Counterclaim Plaintiffs.  )
                                  )

THE WILLIAMS COMPANIES, INC., )
                                  )
        Plaintiff and            )
        Counterclaim Defendant,  )
                                  )
      v.                       ) C.A. No. 12337-VCG
                                  )
ENERGY TRANSFER EQUITY, L.P., )
ENERGY TRANSFER CORP LP, ETE )
CORP GP, LLC, LE GP, LLC, and )
ENERGY TRANSFER EQUITY GP, )
LLC, )
                                  )
        Defendants and      )
        Counterclaim Plaintiffs.  )

## ORDER

AND NOW, this 24th day of June, 2016,

For the reasons set forth in the Memorandum Opinion dated June 27, 2016,

IT IS HEREBY ORDERED that Plaintiff's request to enjoin the Defendants from

terminating or otherwise avoiding their obligations under the Merger Agreement on the basis that Latham & Watkins LLP has failed to deliver a Section 721(a) opinion pursuant to a condition precedent to close is DENIED. This decision constitutes a partial final judgment under Court of Chancery Rule 54(b) and is immediately appealable.

SO ORDERED:

/s/ Sam Glasscock III

Vice Chancellor